**TA LEGAL GROUP PLLC**
Taimur Alamgir, Esq.
Matthew J. Daidola, Esq.
205 E Main Street, Ste. 3-4
Huntington, NY 11743
(914) 552-2669
(631) 942-7399
tim@talegalgroup.com
matthew@talegalgroup.com
*Attorneys for Plaintiff Justin Redlich and FLSA Collective Members*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JUSTIN REDLICH, *on behalf of himself and FLSA Collective Plaintiffs*,<br><br><br>Plaintiff,<br><br> against -<br><br>SPORTIME CLUBS, LLC,<br><br><br>Defendant. | **Case No.:**<br><br><br>**COLLECTIVE ACTION COMPLAINT**<br><br>**Jury Trial Demanded** |

**INTRODUCTION**

1.     Plaintiff, Justin Redlich ("Plaintiff" or "Mr. Redlich"), by and through his undersigned counsel, TA Legal Group PLLC, files this Collective Action Complaint ("Complaint") against Defendant, Sportime Clubs, LLC ("Sportime" or "Defendant")

2.     Mr. Redlich, an award-winning, widely respected tennis professional who consistently generated substantial business for Sportime's elite programs, was targeted for discrimination and retaliation because he is Jewish.

3.     Senior Sportime management, most of all Plaintiff's direct supervisor, repeatedly diminished his accomplishments by attributing his success to anti-Semitic stereotypes, refused to

1

address brazen praise of Adolf Hitler by a program participant, and contested religious accommodations sought by Plaintiff for his Jewish faith and holidays despite granting similar requests to non-Jewish employees.

4.    In response to Plaintiff's complaints about his employer's anti-Semitic practices, Plaintiff's employment was unlawfully terminated on February 10, 2026, in violation of 42 U.S.C. § 1981 and the New York State Human Rights Law. Mr. Redlich was terminated because of Sportime's animus to him based on his Jewish ethnicity and religion, and in retaliation for his protected activity regarding the same.

5.    In addition, Mr. Redlich seeks recovery of unpaid overtime wages on behalf of himself and a collective of similarly situated Tennis Coaches (defined below), pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq.

6.    Mr. Redlich also seeks to recover unpaid overtime individually under the New York Labor Law ("NYLL"), N.Y. Lab. Law § 650 et seq.

7.    As a direct result of Defendant's unlawful policies and actions, Plaintiff has suffered significant economic damages, emotional distress, and other harms. He brings this action to recover unpaid wages, damages, and to hold Defendant accountable for its violations of federal and state law.

8.    Plaintiff has satisfied all timing requirements for bringing this action.

9.    Plaintiff demands a trial by jury on all issues so triable.

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as Plaintiff's claims arise under the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. and 42 U.S.C. § 1981, and thus present a federal question.

9.      This Court has supplemental jurisdiction over Plaintiff's state law claims under the NYLL and NYSHRL pursuant to 28 U.S.C. § 1367, as these claims derive from a common nucleus of operative facts with the federal claims and form part of the same case or controversy.

10.     This Court has jurisdiction over the FLSA collective action claims pursuant to 29 U.S.C. § 216(b).

11.     Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b) because Defendant Sportime Clubs, LLC operates numerous facilities, conducts substantial business, and employed Plaintiff within this District, and a substantial part of the events and omissions giving rise to the claims occurred in this District.

## PARTIES

12.     Defendant Sportime Clubs, LLC is a limited liability company that owns, operates, and manages a network of sports facilities primarily in New York State, that offer instruction and programming for tennis (among other sports).

13.     Sportime has cultivated a reputation as a premier provider of tennis instruction in the New York metropolitan area and beyond, reflected by the company's longstanding partnership with world-renowned tennis professionals John and Patrick McEnroe. Through this partnership, Defendant hosts the prestigious John McEnroe Tennis Academy ("JMTA"), a program dedicated to developing elite junior tennis players for high-level collegiate and professional competition.

14.     Upon information and belief, Defendant conducts business throughout New York, including at the following eleven (11) facilities on Long Island (collectively, the "Long Island Clubs"):

       i.   SPORTIME Bethpage Tennis, 101 Norcross Ave, Bethpage, NY 11714;

ii.  SPORTIME Bethpage Multi-Sport, 4105 Hempstead Turnpike, Bethpage, NY 11714;

iii. SPORTIME Lynbrook, 175 Merrick Rd, Lynbrook, NY 11563;

iv.  SPORTIME Roslyn, 1 Landing Rd, Roslyn, NY 11576;

v.   SPORTIME Syosset Tennis, 75 Haskett Dr, Syosset, NY 11791;

vi.  SPORTIME Port Washington / JMTA Long Island, 100 Harbor Rd, Port Washington, NY 11050;

vii. SPORTIME Westbury (Pickleball / Tennis), 575 Merrick Ave, Westbury, NY 11590;

viii.    SPORTIME Hempstead Lake Tennis & Pickleball, 1000 Lake Dr, West Hempstead, NY 11552;

ix.  SPORTIME Kings Park, 275 Old Indian Head Rd, Kings Park, NY 11754;

x.   SPORTIME Amagansett / JMTA Hamptons, 320 Abrahams Path, Amagansett, NY 11930; and

xi.  SPORTIME Quogue, 2571 Quogue Riverhead Rd, East Quogue, NY 11942.

15.    At all relevant times, Defendant Sportime Club,s LLC was an "employer" within the meaning of the FLSA, 29 U.S.C. § 203(d), and the NYLL, N.Y. Lab. Law § 2(6).

16.    At all relevant times, Defendant was an enterprise engaged in commerce or in the production of goods for commerce within the meaning of 29 U.S.C. §§ 203(r)–(s).

17.    Plaintiff Justin Redlich is a resident of Astoria, New York.

18.    Plaintiff was employed by Defendant from 2020 at Sportime's Kings Park, NY locations, initially as a tennis coach. In 2023, Plaintiff was made Director of Tennis for the Sportime Kings Park facility

19.    With 22 years of experience in playing and coaching tennis, Mr. Redlich was named the USTA Eastern Tennis Professional of the Year in 2024 and Sportime Director of the Year in 2025. Throughout his tenure, Mr. Redlich was recognized for stellar performance and productivity, attracting a large base of clients to Sportime.

20.    At all relevant times, Mr. Redlich was an "employee" of Defendant within the meaning of the FLSA and the NYLL.

## FLSA COLLECTIVE ALLEGATIONS

21.    Plaintiff brings his claims for unpaid overtime wages under the Fair Labor Standards Act ("FLSA") as a collective action pursuant to 29 U.S.C. § 216(b). This action is brought on behalf of himself and all other similarly situated individuals, defined as:

> *All current and former non-exempt Tennis Coaches employed by Sportime at any of the Long Island Clubs at any time within the three (3) years preceding the filing of this Complaint*

(the "FLSA Collective Plaintiffs").

22.    At all relevant times, Plaintiff and the FLSA Collective Plaintiffs were similarly situated. They shared substantially similar job requirements and duties, consisting primarily of providing tennis instruction and related services. They were all subject to Defendant's common policies, practices, and compensation schemes, which systematically failed to pay them overtime compensation at the legally required rate of one and one-half times their regular rate of pay for all hours worked in excess of forty (40) per week. The claims asserted by Plaintiff in this Complaint are representative of the claims of all FLSA Collective Plaintiffs.

23.     This action is properly maintained as an opt-in collective action under Section 16(b) of the FLSA, 29 U.S.C. § 216(b). The FLSA Collective Plaintiffs are readily ascertainable through Defendant's employment records. The names and last known addresses of the FLSA Collective Plaintiffs are available from Defendant, and notice can be provided to them of the pendency of this action to apprise them of their rights and allow them to opt-in to this lawsuit.

**SINGLE INTEGRATED ENTERPRISE ALLEGATIONS**

19.     Upon information and belief, Defendant's eleven (11) Long Island Clubs operate as a single, integrated enterprise for the purposes of the FLSA. Although nominally separate facilities, the Long Island Clubs function as a unified business entity under the common control and ownership of Defendant Sportime Clubs, LLC and should be treated as a single employer under the law.

20.     Courts in this Circuit evaluate whether distinct entities constitute a single employer for FLSA purposes by analyzing four factors: (1) interrelation of operations; (2) centralized control of labor relations; (3) common management; and (4) common ownership or financial control. As alleged below, Defendant and its Long Island Clubs satisfy all four factors.

21.     **Interrelation of Operations:** The Long Island Clubs operate as an integrated network, not as independent entities. Defendant markets these facilities collectively, offering shared programs and a unified membership structure that allows members to reserve court time across multiple locations, including Bethpage, Kings Park, Lynbrook, Roslyn, Syosset, and Port Washington. Tennis programs, clinics, and camps are marketed and administered centrally across these locations. Furthermore, all Long Island Clubs share the same SPORTIME brand identity, a

common website infrastructure, and a unified membership portal, demonstrating their function as components of a single, interrelated business enterprise.

22. **Centralized Control of Labor Relations:** Defendant maintains centralized control over labor relations across its Long Island Clubs. The clubs offer "world-class tennis programming" staffed by a single, unified team of SPORTIME coaches and instructors who work across different facilities. Policies governing court reservations, program scheduling, and cancellations apply uniformly across multiple locations, indicating a centralized authority over day-to-day staff functions and employment practices.

23. **Common Management:** The Long Island Clubs are managed by a single, unified corporate leadership team. The entire network of clubs, including those in Long Island, New York City, and Westchester, is operated under the leadership of CEO Claude Okin. This common executive leadership and centralized corporate management structure confirms that the Long Island Clubs are not independently managed but are instead directed by a single management team, satisfying this factor.

24. **Common Ownership or Financial Control:** Defendant Sportime Clubs LLC owns and operates the Long Island Clubs under a single corporate organization. The facilities are not independently owned but are part of a larger portfolio of over 325 tennis, pickleball, and padel courts managed by the same corporate entity. This unified ownership and financial control demonstrates that the Long Island Clubs are components of a single, financially integrated enterprise.

25. Accordingly, based on the interrelation of operations, centralized control of labor relations, common management, and common ownership, the Long Island Clubs constitute a single

integrated enterprise, and Defendant Sportime Clubs LLC is the employer of Plaintiff and the FLSA Collective Plaintiffs for the purposes of the FLSA.

## FACTS RELEVANT TO PLAINTIFF'S WAGE AND HOUR CLAIMS

### *Plaintiff's Role as a Tennis Coach (2020 – June 2023)*

28.     From approximately 2020 until his promotion in June 2023, Mr. Redlich worked as a full-time Tennis Coach at Defendant's facilities in Kings Park, NY. His primary duties as a Tennis Coach consisted of providing on-court tennis instruction to members, running clinics, and performing related off-court tasks assigned by Defendant.

29.     During this period, Mr. Redlich consistently worked between 55 and 60 hours per week. His workweek was composed of approximately 35 to 40 hours of "on-court" time and approximately 20 hours of "off-court" time.

30.     Defendant compensated Mr. Redlich using a dual-rate hourly system. He was paid a rate of $50.00 per hour for all on-court time and a lower rate of $25.00 per hour for all off-court work, which included ministerial administrative tasks, preparation of evaluations and reports, and other duties as directed.

31.     Despite regularly working far in excess of 40 hours per week, Defendant never paid Mr. Redlich an overtime premium for any of his hours worked. All hours were compensated at his straight-time hourly rates, as reflected by the pay.

32.     For example, during the workweek of December 12, 2022, to December 18, 2022:

      A.  Mr. Redlich worked a total of 46 hours, comprising 26 on-court hours and 20 off-court hours.

B.  Defendant paid him only his straight-time rates for these hours and failed to pay him the legally required overtime premium of one and one-half times his regular rate for the 6 hours he worked over 40.

33.    This failure to pay overtime was a systematic practice applied to Mr. Redlich throughout this period of his employment.

**_Plaintiff's Dual Role as Director of Tennis and Coach (June 2023 – February 2026)_**

34.    In or around June 2023, Defendant promoted Mr. Redlich to the position of Director of Tennis. However, this promotion did not change his primary function as a hands-on tennis coach. Instead, he assumed additional responsibilities while continuing to perform substantial coaching duties.

35.    From June 2023 until February 2026, Mr. Redlich worked in a dual capacity as both Director of Tennis and a high-level Tennis Coach. His weekly hours increased significantly, averaging between 70 and 80 hours per week.

36.    As Director of Tennis at Sportime Kings Park, Mr. Redlich's duties were focused on program development and instruction, not high-level corporate management involving unfettered decisionmaking on behalf of Sportime. His responsibilities included building and growing the tennis program, organizing clinics, and serving as a lead instructor.

37.    Despite his "Director" title, Mr. Redlich lacked the authority characteristic of a bona fide executive or administrative employee. He did not have the authority to hire or terminate employees without seeking and obtaining approval from his superiors. He did not oversee other employees in a customary managerial capacity.

38.    Furthermore, Plaintiff lacked any meaningful discretion over the program's budget and could not make significant financial decisions independently. His role remained fundamentally manual and instructional, centered on his work as a tennis professional and coach.

39.    Kristen Dongvort ("Dongvort"), the Director of Sportime Kings Park, and Jared El Gayeh ("El Gayeh"), the Regional Manager of Sportime, possessed all managerial authority.

40.    During this period, Defendant implemented a complex, multi-component pay structure for Mr. Redlich. He was paid:

A.    A weekly salary of $1,319.69 for his first 40 hours of work, designated for his role as Director of Tennis. This amounts to an average hourly rate of approximately $32.99.

B.    An hourly rate of $50.00 for group tennis coaching, which comprised approximately 10 to 15 hours per week.

C.    A higher hourly rate of $65.00 for private tennis coaching, which comprised approximately 20 to 25 hours per week.

41.    This compensation structure was a mechanism by which Defendant extracted 70 to 80 hours of work from Mr. Redlich each week without ever paying him an overtime premium. For all hours worked in excess of 40 per week, Mr. Redlich was only paid his straight-time hourly rates of $50.00 or $65.00. At no point did Defendant pay him one and one-half times his regular or blended rate of pay for his significant overtime hours.

***Sportime's Common Overtime Violations As To Plaintiff and Other Tennis Coaches***

42.    At all relevant times, Defendant's policies and practices resulted in the systematic denial of overtime wages to Mr. Redlich and other similarly situated tennis coaches in violation of the FLSA and NYLL. Defendant utilized a complex, multi-rate compensation scheme designed to

obscure its overtime obligations and unlawfully deprive its employees of wages earned for hours worked in excess of forty (40) per week, in direct violation of the FLSA and NYLL.

43.      As a matter of corporate policy, from 2020 through June 2023, Defendant paid Plaintiff and other tennis coaches at two different straight-time hourly rates for on-court and off-court work. Despite these employees regularly working more than 40 hours per week, Defendant failed to calculate a regular rate of pay and failed to pay an overtime premium of one and one-half times that rate for any overtime hours. All hours were compensated at straight-time rates, regardless of the total number of hours worked in a workweek.

44.      From June 2023 through February 2026, Defendant subjected Plaintiff to an even more convoluted pay structure, combining a fixed weekly salary with multiple, distinct hourly rates for different types of coaching work. This hybrid system was a mechanism to extract 70 to 80 hours of work from Plaintiff per week while unlawfully avoiding its obligation to pay a premium for any overtime hours worked.

45.      Defendant's unlawful pay practices are demonstrated by the pay stubs issued to Plaintiff.

46.      For example, during the workweek of January 19, 2026, to January 25, 2026, as set forth on the paystub issued for that period:

   A.   Plaintiff worked a total of **67.5 hours**. This comprised 40 hours designated as his "Director" duties, 12 hours of "regular" tennis coaching, and 15.5 hours of "director level" tennis coaching.

   B.   Plaintiff worked **27.5 hours** of overtime during this week.

   C.   However, Defendant paid him only his straight-time rates for all hours worked and failed to pay him any overtime premium whatsoever.

47.    Similarly, for the workweek of February 2, 2026, to February 8, 2026,

    1.    Plaintiff worked a total of **69 hours**. This was composed of 40 hours for his Director role, 8 hours of "regular" coaching, and 21 hours of "director level" coaching.

    2.    Plaintiff worked **29 hours** of overtime during this week. Again, Defendant willfully failed to pay him the legally mandated overtime premium of one and one-half times his regular rate for these overtime hours.

48.    These examples are not isolated errors; they are representative of Defendant's uniform and consistent policy of wage theft applied to Plaintiff throughout his employment. Defendant knew or acted in reckless disregard of the fact that its compensation practices violated the overtime provisions of the FLSA and NYLL.

49.    Upon information and belief, the FLSA Collective Plaintiffs were subjected to identical or substantially similar unlawful pay practices. They were compensated at hourly rates or through other non-exempt pay structures and were required to work more than 40 hours per week without receiving overtime compensation at a rate of one and one-half times their regular rates of pay.

50.    Plaintiff never entered into any agreement with Sportime that his compensation included overtime, either from 2020-2023, or thereafter. Similarly, FLSA Collective Plaintiffs never entered into any agreement with Sportime that the compensation they received pursuant to identical or similar structures to Plaintiff's included overtime.

51.    Defendant's decision to deny overtime pay was not based on individualized assessments but was a blanket policy applied to all tennis coaches. This common policy of failing

to pay legally required overtime wages is the central issue uniting the claims of Plaintiff and the FLSA Collective Plaintiffs, rendering their claims appropriate for collective resolution.

52.     Furthermore, Defendant failed to establish, maintain, and preserve accurate payroll records showing for each week the total hours worked by Plaintiff and the FLSA Collective Plaintiffs, their regular rates of pay, and the overtime premium payments due, as required by both federal and state law.

### *Plaintiff Was Deprived of Overtime At The Blended Rate Required Under the FLSA and NYLL*

50.     The FLSA and NYLL mandate that when a non-exempt employee performs work at two or more different hourly rates during a single workweek, any overtime compensation must be calculated based on the employee's "regular rate" of pay, which is determined by a weighted average of all rates paid.

51.     This legal requirement was directly applicable to Plaintiff's employment from June 2023 through February 2026, during which he was compensated through a combination of a weekly salary for his Director duties and two different hourly rates for his coaching duties. For each workweek in which Plaintiff worked more than 40 hours, Defendant was legally obligated to: (1) calculate his total straight-time compensation from all sources; (2) divide that total by the total number of hours worked to determine his blended regular rate; and (3) pay him an overtime premium of at least one and one-half times that blended rate for all hours worked over 40.

52.     Defendant willfully failed to perform this calculation and instead paid Plaintiff only his straight-time rates for all hours worked. For the workweek of February 2, 2026, to February 8, 2026, the proper calculation is as follows:

    1.   **Total Straight-Time Earnings**: Plaintiff's total straight-time pay for his 69 hours of work was $3,084.69, comprising his $1,319.69 salary, $400.00 for

8 hours of regular coaching at $50/hour, and $1,365.00 for 21 hours of director-level coaching at $65/hour.

2. **Blended Regular Rate**: Plaintiff's blended regular rate for this week was **$44.70** ($3,084.69 total pay / 69 total hours).

3. **Blended Overtime Rate**: The correct overtime rate was **$67.06** ($44.70 x 1.5).

4. **Unpaid Overtime**: Defendant should have paid Plaintiff this premium rate for the **29 overtime hours** he worked. Instead, Defendant paid him only straight time, unlawfully withholding the overtime premium due.

53.    While the FLSA provides a narrow exception under 29 U.S.C. § 207(g)(2) that allows an employer to pay overtime at 1.5 times the bona fide rate for the specific work performed during overtime hours, this exception only applies if there was a clear "agreement or understanding" between the employer and employee "before performance of the work". No such agreement or understanding existed between Plaintiff and Defendant. Defendant never communicated such a policy and never tracked which specific tasks were performed during overtime hours versus non-overtime hours.

54.    Defendant's failure to calculate and pay overtime based on Plaintiff's blended regular rate was a willful and systematic violation of the FLSA, resulting in a substantial underpayment of wages owed to Plaintiff for his significant overtime work.

### _Plaintiff is Not An Exempt Executive or Administrative Employee_

56.    The executive exemption under the FLSA applies to an employee: (1) who is compensated on a salary basis; (2) whose primary duty is management of the enterprise or a recognized department thereof; (3) who customarily and regularly directs the work of two or more

other employees; and (4) who has the authority to hire or fire, or whose recommendations as to hiring, firing, advancement, or promotion are given particular weight. 29 C.F.R. § 541.100. Plaintiff fails to meet these criteria.

57.    **Failure to Meet the Salary Basis Test:** Plaintiff was not compensated on a true salary basis. His pay was comprised of multiple hourly rates for coaching work, supplemented by a fixed weekly amount designated for his first 40 hours. This hybrid, hour-dependent structure is inconsistent with the salary basis requirement, which mandates a predetermined amount of compensation each pay period that is not subject to reduction because of variations in the quality or quantity of work performed.

58.    **Failure to Meet the Primary Duty Test:** Plaintiff's primary duty was not management. Notwithstanding his "Director of Tennis" title, his role was overwhelmingly focused on performing manual and instructional labor as a hands-on tennis coach. The majority of his 70-80 hour workweeks was spent on court, providing instruction. His duties related to "building the tennis pro[gram]" were subordinate to his core function as a coach and did not constitute management of the enterprise or a department as his primary duty.

59.    **Failure to Meet the Supervision and Authority Tests:** Plaintiff did not customarily and regularly direct the work of two or more other employees. Moreover, he lacked the authority to hire or terminate other employees without first obtaining approval from his superiors. His suggestions and recommendations on personnel matters were not given the "particular weight" required by the regulation, as final decision-making authority rested with Defendant's upper management.

### *The Administrative Exemption Does Not Apply*

60.    The administrative exemption under the FLSA and NYLL applies to an employee: (1) who is compensated on a salary basis; (2) whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer; and (3) whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance. 29 C.F.R. § 541.200; 12 N.Y.C.R.R. § 142-2.14. Plaintiff does not meet these requirements.

61.    **Failure to Meet Salary Basis and Primary Duty Tests:** As alleged above, Plaintiff was not paid on a salary basis. Furthermore, his primary duty was manual and instructional work (coaching), which is not "office or non-manual work" related to Defendant's general business operations. His work pertains to the "production" side of Defendant's business—delivering the tennis services sold to customers—not the administrative tasks involved in managing the business itself.

62.    **Failure to Exercise Discretion and Independent Judgment:** Plaintiff's role did not include the exercise of discretion and independent judgment with respect to matters of significance. He lacked the authority to set or deviate from budgets, make significant financial commitments on behalf of Defendant, or formulate management policies. His work was guided by established instructional methods and the directives of his superiors, particularly Kristen Dongvort among others,  not high-level independent judgment.

63.    Because Plaintiff does not satisfy the stringent requirements for either the executive or administrative exemptions, Defendant's classification of him as an exempt employee was improper and in violation of the FLSA and NYLL.

***Recordkeeping and Wage Notice Violations (NYLL § 195.1 & § 195.3)***

64.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

65.    Defendant willfully violated the notice and recordkeeping requirements of the New York Labor Law ("NYLL"). Pursuant to N.Y. Lab. Law § 195.1, an employer must provide its employees, at the time of hiring, a notice containing, inter alia, the employee's rate or rates of pay and basis thereof, any allowances claimed as part of the minimum wage, and the regular pay day. Defendant failed to provide Plaintiff with a wage notice that complied with these requirements upon his hiring and upon each subsequent change to his compensation structure.

66.    Defendant further violated the NYLL by failing to provide Plaintiff with accurate wage statements with each payment of wages, as required by N.Y. Lab. Law § 195.3. The wage statements provided to Plaintiff were deficient and inaccurate, as they failed to state Plaintiff's regular and overtime rates of pay, the number of overtime hours he worked, and the correct total wages due. This failure was part of Defendant's systematic effort to obscure its failure to pay overtime.

67.    Moreover, Defendant violated N.Y. Lab. Law § 661, which mandates that every employer "shall establish, maintain, and preserve for not less than six years contemporaneous, true, and accurate payroll records". These records must show for each non-exempt employee "the regular hourly rate or rates of pay, the overtime rate or rates of pay, the number of regular hours worked, and the number of overtime hours worked". Defendant willfully failed to maintain such accurate records for Plaintiff and the FLSA Collective Plaintiffs.

68.    Defendant's violations of NYLL §§ 195 and 661 were willful and knowing. These failures were not mere administrative errors but were part of a deliberate corporate policy to deny

Plaintiff and other similarly situated employees information about their lawful wages and to conceal Defendant's systematic underpayment of overtime compensation.

69.     As a direct and proximate result of Defendant's willful violations of these provisions, Plaintiff is entitled to recover statutory damages, interest, and reasonable attorneys' fees and costs pursuant to N.Y. Lab. Law § 198.

## FACTS RELEVANT TO PLAINTIFF'S DISCRIMINATION AND RETALIATION CLAIMS

70.     Despite being an outstanding performer who consistently generated significant business for Defendant's tennis programs and received accolades for his professional achievements, Plaintiff was subjected to a continuous pattern of ethnic and religious discrimination, a hostile work environment, and retaliation because he is Jewish.

71.     This discriminatory and retaliatory conduct was perpetrated and/or condoned by Plaintiff's direct supervisor, Kristen Dongvort, and the Regional Director, Jared El Gayeh. Upon information and belief, neither Ms. Dongvort nor Mr. El Gayeh is Jewish.

72.     Throughout his employment, Ms. Dongvort repeatedly and discriminatorily attributed Plaintiff's professional success and ability to attract and retain clientele to his being Jewish. On multiple occasions, Ms. Dongvort would denigrate Plaintiff's accomplishments by stating that his Jewish identity was "the only reason they like you."

73.     These comments constituted a form of discriminatory stereotyping, designed to diminish Plaintiff's accomplishments and suggest they were not earned through his own merit, skill, and dedication, but were instead an unearned consequence of his ethnic and religious identity.

74.     The anti-Semitic hostility in the workplace escalated in the fall of 2024, when a youth player in one of Defendant's tennis programs announced during a group tennis coaching

session that he wanted to be on "team Austria" because Adolf Hitler (the Austrian-born leader of Nazi Germany during World War II) was his "favorite historical figure."

75.    Plaintiff, along with Jewish group lesson participants, parents, and co-workers were naturally deeply disturbed by this veneration of Hitler within a Sportime program.

76.     Plaintiff reported the incident to Ms. Dongvort requested that she take appropriate action to address the player's conduct.

77.    Ms. Dongvort refused to take any corrective or disciplinary action, remarkably characterizing veneration of Hitler as a permissible exercise of "free speech." This approach suggests anti-Semitic views – particularly Defendant, as a private company, had the authority and responsibility to prevent such hateful rhetoric and maintain a non-hostile environment for its employees and clients.

78.    Defendant's discriminatory animus, perpetrated through Ms. Dongvort, was further demonstrated by its pattern of prohibiting Plaintiff from taking leave for Jewish holidays or aggressively berating Plaintiff for doing so when he did. This occurred most recently in December 2025, when Ms. Dongvort contested Plaintiff's request for time off to observe Hanukkah.

79.    In response, Plaintiff made a protected complaint to Ms. Dongvort. He objected to her resistance to his request for religious accommodation, pointing out that Defendant regularly granted similar leave requests to non-Jewish employees for both secular and religious holidays without issue (and was in fact closed on Christian religious holidays).

80.    Instead of addressing the merits of Plaintiff's complaint, Ms. Dongvort responded by yelling at Plaintiff in an aggressive and hostile manner. This aggressive outburst demonstrated clear animus toward Plaintiff for his religion and for his protected activity in complaining about discrimination. Plaintiff was shocked and intimidated by her conduct.

81.    At no point during his entire tenure with Defendant did Plaintiff ever receive any discipline, negative performance feedback, or warnings regarding his job performance. To the contrary, his work was consistently recognized as exceptional, earning him awards such as Sportime Director of the Year as recently as 2025.

82.    On or about February 10, 2026, Defendant abruptly terminated Plaintiff's employment. The termination was carried out by Ms. Dongvort and Regional Director Jared El Gayeh.

83.    When they terminated his employment, Ms. Dongvort and Mr. El Gayeh refused to provide Plaintiff with a reason for the adverse action, despite his request for an explanation.

84.    The termination of Plaintiff's employment was pretextual. It was not based on his performance or any legitimate, non-discriminatory business reason, but was the direct result of Defendant's ethnic and religious animus and was an unlawful act of retaliation for Plaintiff's protected complaints opposing discrimination.

85.    Plaintiff engaged TA Legal Group PLLC to prosecute this agreement and agreed to pay the firm a reasonable fee for its services.

## CAUSES OF ACTION

### COUNT I: Failure to Pay Overtime Wages in Violation of the Fair Labor Standards Act (29 U.S.C. § 201 et seq.) (On Behalf of Plaintiff and the FLSA Collective Plaintiffs)

88.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

89.    At all relevant times, Defendant was an employer engaged in commerce or in the production of goods for commerce and was subject to the overtime requirements of the Fair Labor Standards Act ("FLSA"), specifically 29 U.S.C. § 207.

90.     At all relevant times, Defendant had at least $500,000 in gross volume of business.

91.     At all relevant times, Plaintiff and the FLSA Collective Plaintiffs were "employees" within the meaning of the FLSA, 29 U.S.C. § 203(e).

92.     Defendant willfully misclassified Plaintiff and the FLSA Collective Plaintiffs as exempt from the FLSA's overtime provisions and, as a matter of uniform corporate policy, failed to pay them overtime compensation at a rate of one and one-half times their regular rates of pay for hours worked in excess of forty (40) per week.

93.     Defendant's conduct was knowing, willful, and in reckless disregard of the clear requirements of the FLSA.

94.     As a direct and proximate result of Defendant's willful violations, Plaintiff and the FLSA Collective Plaintiffs are entitled to recover their unpaid overtime wages, an equal amount in liquidated damages, prejudgment and post-judgment interest, and reasonable attorneys' fees and costs pursuant to 29 U.S.C. § 216(b)

95.     Plaintiff has made a modest factual showing that he and the other FLSA Collective Plaintiffs are "similarly situated" and were victims of Defendant's common policies and practices that violated the FLSA. Courts in this Circuit have held that at the conditional certification stage, a plaintiff need only make a minimal showing to demonstrate a commonality with other potential opt-in plaintiffs. The focus is not on whether the plaintiffs are identical, but whether they were subjected to a common unlawful practice

96.     The common policies and practices at issue include, but are not limited to, misclassifying tennis coaches as exempt from overtime, failing to pay any overtime premium for hours worked in excess of forty (40) per week, and utilizing multi-rate compensation schemes

without properly calculating and paying overtime based on a blended rate. These uniform policies affected all tennis coaches across Defendant's Long Island Clubs

97.    Any factual variations among the members of the proposed collective do not defeat conditional certification at this stage. As courts in this district have recognized, the question of whether variance of job duties precludes collective treatment is more appropriately analyzed at the decertification stage, not at the initial conditional certification stage

98.    Accordingly, Plaintiff respectfully requests that the Court grant conditional certification of the FLSA Collective and authorize the prompt issuance of a Court-approved notice to all potential members of the FLSA Collective, apprising them of the pendency of this action and their right to opt in

99.    To facilitate this notice, Plaintiff further requests that the Court order Defendant to produce, within a reasonable time, a complete and accurate list of the names, last known mailing addresses, email addresses, and dates of employment of all individuals in the proposed FLSA Collective.

**_COUNT II: Failure to Pay Overtime Wages in Violation of the New York Labor Law_**
**_(N.Y. Lab. Law §§ 650 et seq.; 12 N.Y.C.R.R. Part 142)_**

100.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

101.    At all relevant times, Defendant was an "employer" and Plaintiff was an "employee" within the meaning of the New York Labor Law ("NYLL").

102.    The NYLL and its supporting regulations require that employers pay employees at a rate of one and one-half times their regular rate for all hours worked in excess of forty (40) in a workweek.

103.    In violation of N.Y. Lab. Law §§ 652 and 663, and 12 N.Y.C.R.R. § 142-2.2, Defendant failed to pay Plaintiff overtime wages for hours worked over forty (40) and failed to maintain accurate records of his hours worked and rates of pay.

104.    Defendant's violations of the NYLL were willful and part of a deliberate, company-wide policy to deny lawful overtime compensation to its employees.

105.    As a direct result of Defendant's violations, Plaintiff is entitled to recover all unpaid wages, an additional 100% of the unpaid wages as liquidated damages, prejudgment and post-judgment interest, and reasonable attorneys' fees and costs pursuant to N.Y. Lab. Law §§ 198 and 663.

### *COUNT III: Violations of New York Labor Law §§ 195.1 and 195.3*

100.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

101.    In willful violation of N.Y. Lab. Law § 195.1, Defendant failed to provide Plaintiff, at the time of his hiring and upon subsequent changes to his pay, with a written notice containing his rate or rates of pay, the basis thereof, and other legally required information.

102.    In willful violation of N.Y. Lab. Law § 195.3, Defendant failed to provide Plaintiff with true and accurate wage statements with each payment of wages. The statements provided did not accurately list all hours worked, the applicable regular and overtime rates of pay, or the total wages due.

103.    As a direct and proximate result of Defendant's willful violations of these provisions, Plaintiff is entitled to recover statutory damages, prejudgment and post-judgment interest, and reasonable attorneys' fees and costs pursuant to N.Y. Lab. Law § 198.

### COUNT IV: Ethnic and Religious Discrimination in Violation of the New York State Human Rights Law

104.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

105.    The New York State Human Rights Law ("NYSHRL") prohibits employers from discriminating against an employee in the terms, conditions, or privileges of employment on the basis of their religion.

106.    Plaintiff is a member of a protected class by virtue of being ethnically Jewish and of Jewish faith. He was qualified for his position and performed his job duties in an exemplary manner.

107.    Defendant, through its supervisor and agent Kristen Dongvort, subjected Plaintiff to adverse employment actions, including but not limited to denying requests for religious accommodation and ultimately terminating his employment, under circumstances giving rise to an inference of discrimination.

108.    Defendant's actions were willful, malicious, and undertaken with reckless indifference to Plaintiff's legally protected rights, thereby entitling Plaintiff to recover all economic damages, compensatory damages for emotional distress, punitive damages, and reasonable attorneys' fees and costs.

### COUNT V: Hostile Work Environment in Violation of the New York State Human Rights Law

109.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

110.    Defendant subjected Plaintiff to a hostile work environment by creating, encouraging, and condoning a workplace permeated with severe and pervasive harassment based on his ethnicity and religion.

111.    This harassment included, but was not limited to, repeated anti-Semitic comments from his supervisor, the denial of leave for Jewish holidays, and Defendant's failure to address hateful rhetoric from others in the workplace.

112.    The conduct was unwelcome and was sufficiently severe and pervasive to alter the conditions of Plaintiff's employment and create an abusive, intimidating, and offensive working environment. Defendant was aware of the harassment, as Plaintiff repeatedly complained, yet failed to take any appropriate remedial action.

113.    As a direct result of Defendant's unlawful conduct, Plaintiff has suffered significant emotional distress and is entitled to compensatory and punitive damages, as well as reasonable attorneys' fees and costs.

### *COUNT VI: Retaliation in Violation of the New York State Human Rights Law*

114.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

115.    The NYSHRL prohibits employers from retaliating against any employee for opposing any practices forbidden under the law.

116.    Plaintiff engaged in protected activity by complaining to Defendant about the ongoing religious discrimination and hostile work environment.

117.    Defendant was aware of Plaintiff's protected complaints.

118.    As a direct result of his protected activity, Defendant took adverse employment action against Plaintiff, culminating in the abrupt termination of his employment.

25

119.    A causal connection exists between Plaintiff's protected activity and his termination. The termination was pretextual and motivated by retaliatory animus.

120.    As a direct and proximate result of Defendant's unlawful retaliation, Plaintiff has suffered economic losses, emotional distress, and other damages, and is entitled to recover back pay, front pay, compensatory and punitive damages, and reasonable attorneys' fees and costs.

### COUNT VII: Ethnic Discrimination and Retaliation in Violation of 42 U.S.C. § 1981

121.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

122.    This cause of action is brought pursuant to 42 U.S.C. § 1981, which guarantees all persons within the jurisdiction of the United States the same right to make and enforce contracts, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens.

123.    As a person of Jewish ethnicity and ancestry, Plaintiff is a member of a protected class under Section 1981, which prohibits discrimination based on ancestry or ethnic characteristics.

124.    Plaintiff's employment relationship with Defendant constituted a contract for the purposes of Section 1981.

125.    Defendant, acting through its supervisors and agents ,intentionally discriminated against Plaintiff on the basis of his Jewish ethnicity, thereby interfering with his ability to make, perform, modify, and terminate his employment contract and to enjoy all benefits, privileges, terms, and conditions of that contractual relationship.

126.    Defendant's unlawful discrimination included, but was not limited to: subjecting Plaintiff to a hostile work environment permeated with anti-Semitic animus; denigrating his

26

professional accomplishments by attributing them to discriminatory ethnic stereotypes; denying him privileges afforded to non-Jewish employees; and ultimately terminating his employment based on his ethnicity.

127.    Plaintiff engaged in protected activity under Section 1981 by complaining about and opposing the ethnically discriminatory conduct and hostile work environment to which he was subjected.

128.    Defendant was aware of Plaintiff's protected complaints.

129.    As a direct and proximate result of his protected activity, Defendant took adverse employment action against Plaintiff, culminating in the abrupt termination of his employment.

130.    A causal connection exists between Plaintiff's protected activity and his termination. Defendant's proffered reasons, or lack thereof, for the termination were a pretext for unlawful retaliation.

131.    Defendant's discriminatory and retaliatory actions were undertaken willfully, maliciously, and with reckless indifference to Plaintiff's federally protected rights.

132.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer significant economic damages, including lost wages and benefits, as well as non-economic damages in the form of emotional distress, mental anguish, and humiliation.

133.    Pursuant to 42 U.S.C. §§ 1981 and 1988, Plaintiff is entitled to recover back pay, front pay, compensatory damages, punitive damages, and his reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Justin Redlich, on behalf of himself and the FLSA Collective Plaintiffs, respectfully requests that the Court enter judgment in his favor and against Defendant Sportime Clubs, LLC, and grant the following relief:

- **A.** Declaring that Defendant's conduct, policies, and practices complained of herein willfully violated the rights of Plaintiff and the FLSA Collective Plaintiffs under the Fair Labor Standards Act (29 U.S.C. § 201 et seq.), 42 U.S.C. § 1981, the New York Labor Law (§§ 190 et seq. and §§ 650 et seq.), and the New York State Human Rights Law;

- **B.** Awarding Plaintiff and the FLSA Collective Plaintiffs all unpaid overtime compensation due and owing under the FLSA, together with an equal amount in liquidated damages pursuant to 29 U.S.C. § 216(b);

- **C.** Awarding Plaintiff all unpaid wages and overtime compensation due and owing under the NYLL, together with liquidated damages equal to 100% of the amount of underpaid wages pursuant to N.Y. Lab. Law § 663;

- **D.** Awarding Plaintiff statutory damages for Defendant's violations of N.Y. Lab. Law §§ 195.1 and 195.3;

- **E.** Ordering Defendant to reinstate Plaintiff to his former position as Director of Tennis and Tennis Coach or, in the alternative, awarding Plaintiff front pay for the loss of future earnings and benefits;

- **F.** Awarding Plaintiff compensatory damages for the emotional distress, mental anguish, humiliation, and other non-economic injuries caused by Defendant's unlawful discrimination, retaliation, and creation of a hostile work environment;

28

- **G.** Awarding Plaintiff punitive damages for Defendant's willful, malicious, and retaliatory conduct in violation of 42 U.S.C. § 1981 and the New York State Human Rights Law;

- **H.** Awarding Plaintiff and the FLSA Collective Plaintiffs pre-judgment and post-judgment interest at the highest rates permitted by law;

- **I.** Awarding Plaintiff and the FLSA Collective Plaintiffs their reasonable attorneys' fees, costs, and expenses incurred in prosecuting this action, pursuant to 29 U.S.C. § 216(b), N.Y. Lab. Law §§ 198 and 663, the NYSHRL, and 42 U.S.C. § 1988;

- **J.** Enjoining Defendant from engaging in the unlawful practices described herein, and requiring Defendant to adopt and implement lawful wage-and-hour policies and anti-discrimination training programs;

- **K.** Authorizing the conditional certification of this matter as a collective action under the FLSA and directing that Court-approved notice be distributed to all putative FLSA Collective Plaintiffs;

- **L.** Appointing Plaintiff as the FLSA Collective Representative; and

- **M.** Granting such other and further relief as this Court deems just, equitable, and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues so triable.

Dated:       Huntington, NY
             March 13, 2026

**TA LEGAL GROUP PLLC**
*Attorneys for Plaintiff and Class Members*

By:   _____
      Taimur Alamgir, Esq.
      Matthew J. Daidola, Esq.
      205 East Main Street, Ste. 3-4
      Huntington, NY 11743
      (914) 552-2669
      (631) 942-7399
      tim@talegalgroup.com
      matthew@talegalgroup.com